## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

**Johana Santa Maria,**

      **Plaintiff,**

    **v.**

**Loyola University of Chicago Stritch
School of Medicine and The National
Board of Medical Examiners,**

      **Defendants.**

### COMPLAINT

Plaintiff, Johana Santa Maria, by and through her attorney, T. Andrew Horvat of Horvat Law, LLC, brings this action for violations of the American with Disabilities Act, Section 504 of the Rehabilitation Act, and related claims in violation of Illinois law. In support thereof, Ms. Santa Maria asserts as follows:

### Jurisdiction and Venue

1. This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §1331 as Plaintiff seeks redress for Defendants' violations of federal law.

2. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367.[1]

3. Venue is proper pursuant to 28 U.S.C. U.S.C. § 1391(b) because a substantial part of the

---

[1] Plaintiff has filed a complaint with the Illinois Department of Human Rights for violations of the Illinois Human Rights Act. Once granted the right to bring suit for violations of the Act, Plaintiff will seek leave of this Court to amend her complaint to include these additional claims.

events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

**Parties**

4.   Johana Santa Maria ("Plaintiff" or "Ms. Santa Maria") is the Plaintiff in the above-entitled matter. Ms. Santa Maria is a former medical student at Loyola University of Chicago Stritch School of Medicine who at all relevant times resided within the Northern District of Illinois.

5.   Defendant Loyola University of Chicago Stritch School of Medicine ("Stritch" or the "University") is a non-profit, private secondary institution and a place of public accommodation under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.* ("ADA").

6.   Loyola University of Chicago Stritch School of Medicine is located in Cook County, IL.

7.   Stritch is a recipient of federal funding pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C § 794 *et seq*.

8.   The National Board of Medical Examiners ("NBME") is a District of Columbia not-for-profit organization headquartered at 3750 Market Street, Philadelphia, Pennsylvania.

9.   The NBME maintains an office in Chicago, IL.

10. The NBME develops and administers a series of standardized timed examinations that are known collectively as the United States Medical Licensing Examination ("USMLE").

11. The NBME administers these examinations for medical students through third party-vendors throughout the United States, including for numerous medical schools and their students within the Northern District of Illinois.

12. The NBME is a recipient of federal funding pursuant to Section 504 of the Rehabilitation Act, 29 U.S.C § 794 *et seq*.

**Facts**

13. Plaintiff is a first-generation Mexican American and the first of her family to go to college upon whom the hopes and financial aspirations of her family depend.

14. On February 27, 2018, Plaintiff was accepted into Stritch's Doctor of Medicine program ("the program").

15. In exchange for paying tuition to Stritch, the University agreed to confer a Doctor of Medicine degree to Plaintiff upon her completion of the degree's requirements.

16. In addition, and in consideration for tuition paid, Stritch, its employees, and Plaintiff relied upon and agreed to abide by the rules and procedures promulgated and outlined in its student handbooks, including the Stritch School of Medicine's Academic Policy Manual.

17. Shortly after her acceptance into Stritch, Plaintiff and her husband moved from California eventually settling down in Cook County, IL.

18. In the Summer of 2018, Plaintiff began her first year in the program with the goal of obtaining her Doctor of Medicine degree and entering the field of ophthalmology.

19. Based on her limited financial means, and the inability of her family to provide financial support, Plaintiff took out significant loans and applied for numerous grants and scholarships to offset the costs of attending Stritch.

20. Based on her talents and dedication, Plaintiff was awarded several grants and scholarships as well as several academic achievement awards over the next several years.

21. While on track to obtain her Doctor of Medicine in 2022, due to the Defendants' discriminatory conduct, Plaintiff's initial success would be short-lived.

**Plaintiff's Disabilities Permanently and Significantly Impact Major Life Functions.**

22. Despite her initial success, at all relevant times Plaintiff suffered from significant

maladies including Major Depressive Disorder (MDD), Post-Traumatic Stress Disorder (PTSD), Generalized Anxiety Disorder (GAD), and Attention-Deficit Hyperactivity Disorder (ADHD).

23. As at all relevant times, Plaintiff's maladies permanently and significantly impacted numerous life functions including, but not limited to, the ability to socialize, concentrate, process information, and sleep.

24. At all times relevant, Plaintiff, with or without a reasonable modification, Plaintiff met and still meets the eligibility requirements for the receipt of educational services, programs, and activities provided by the Defendants.

25. As a result of her maladies, Plaintiff received a series of medical treatments that resulted in significant adverse reactions, including, but not limited to, the development of a severe sleep abnormality necessitating a clinical sleep study, and a grand mal seizure brought about by the side-effects of her antidepressant medication.

26. At all relevant times while a student at the Stritch, Plaintiff, to combat her maladies and obtain a favorable medication regimen, was under the professional care of Dr. Kim Duque, M.D., a board-certified psychiatrist, a Clinical Assistant Professor at Stritch, and the Director of Stritch's Residency Wellness Program.

**Plaintiff Requests and is Initially Granted Reasonable Modifications by Stritch.**

27. During Plaintiff's time in the program, Stritch had no formal process by which a student could request a modification based on her disability.

28. Moreover, at all times relevant, Stritch failed to employ a disability compliance officer responsible for handling disability-based complaints and lacked formal grievance procedures that provided for the prompt and equitable resolution of disability complaints.

4

29. As a result, Plaintiff was required to send her requests to a variety of different Stritch personnel including student coordinators, associate deans, and directors of the University's various departments, many of whom were inadequately trained in responding to such requests.

30. Nevertheless, beginning in the Fall of 2019, and continuing through the Fall of 2021, Plaintiff requested and received educational modifications including extensions of time to complete exams and excused absences so that Plaintiff could address her medical needs.

31. Plaintiff's modification requests were often supplemented with detailed documentation of her medical conditions and the severe side-effects caused by her inability to settle on a favorable course of treatment.

32. As a result, Stritch personnel were at all relevant times aware of Plaintiff's medical conditions and the serious side-effects she was suffering from.

**Step 1 of United States Medical Licensing Examination.**

33. The NBME administers the United States Medical Licensing Examination ("USMLE").

34. The USMLE has three components, or "Steps," that medical students must pass before they can apply for a medical license.

35. Step 1 is a computer-based, multiple-choice exam that assesses a student's grasp of scientific concepts. Students typically take Step 1 before their final year of medical school.

36. Step 2 has two parts: Clinical Knowledge ("CK"), a computer-based, multiple-choice exam that assesses medical knowledge and clinical science, and Clinical Skills ("CS") that assesses students in a clinical setting. Step 2 must be taken before graduation.

37. Step 3 is a computer-based exam that assesses the application of medical and scientific knowledge to the practice of medicine. Step 3 must be taken before applying for a medical

license.

38. These examinations are relied upon by states throughout the country in making decisions regarding medical licensure.

39. To receive a Doctor of Medicine degree (i.e., M.D.), to apply and/or be considered for medical residency training programs, and to become licensed as a physician, medical students must first take and pass all three of the USMLE "Step" examinations.

40. Based on the inherent difficulty of the exams, and in particular Step 1, many medical schools allow students three and sometimes four attempts to pass Step 1 before dismissing a student for academic failure.

41. In accordance with industry standard, Stritch allows its medical students three (3) opportunities to pass the Step 1 examination. After three failures, students are dismissed from Stritch.

**The Stritch School of Medicine's Academic Policy Manual.**

42. At all relevant times, to enforce the rights of Stritch 's medical students, Loyola University of Chicago and the Stritch School of Medicine "approved and published policies and procedures that must be followed to avoid a change in the student's academic status, withholding of grades, denial of course registration, being asked to leave an instructional or clinical area, removal from campus, or withdrawal of the normal rights and privileges of a student."

43. These rights, contained in "The Stritch School of Medicine Academic Policy Manual" ("policy manual"), included a "non-discrimination policy" purporting to "not discriminate on the basis of race, color, religion, sex, age, sexual orientation, gender identity, national or ethnic origin, ancestry, disability … in the administration of its educational policies, admissions

policies, scholarship and loan programs, and athletic and other school-administered programs, or in any aspects of its employment of faculty and staff."

44. In addition to its non-discrimination policy, the policy manual precluded Stritch from taking adverse academic action against a medical student arbitrarily or otherwise in the absence of good cause.

45. To that end, and in recognition of the inherent difficulty of the Step 1 examination, the policy manual provided that Stritch students will be given three opportunities to pass the Step 1 examination before dismissal.

46. In accordance with the policy manual, should a student fail the Step 1 examination a second time, the policy manual mandated that the student meet with a representative of the Academic Center for Excellence ("ACE") and Office of Student Affairs ("OSA") for mandatory services aimed at determining the best course of study in preparation for the third and final attempt at the Step 1 examination.

47. Per the policy manual, should the student fail her third and final attempt, the student was subject to dismissal but retained the right to appeal the dismissal or "otherwise change enrollment status."

48. Among the procedural rights conferred to a student subject to dismissal for failing the Step 1 examination included:

    a.  the right to a hearing before the Student Appeal Board;

    b.  the right to be informed in writing of the date, time, and place of the hearing;

    c.  the opportunity to he heard at the hearing;

    d.  the right to be represented by faculty, peer group, or "any ally" of the student at the hearing;

    e.   the right to have the decision of the Student Appeal Board forwarded to Stritch 's Dean for approval or rejection; and

    f.   the right to appeal the decision of the Student Appeal Board and/or Dean to the University Provost for a final determination.

49. At all relevant times while enrolled at Stritch, Plaintiff relied upon the rights and procedures guaranteed to her in the policy manual.

**Plaintiff Requests Reasonable Modifications from the NBME.**

50. In anticipation of her first Step 1 test, on April 26, 2021, Plaintiff requested reasonable modifications from the NBME.

51. Specifically, Plaintiff requested additional time to take the test, a private room in which to take the test, and that, due to side effects of her medication, she be allowed to take a snack and beverage into the testing facility.

52. Accompanying Plaintiff's request was documentation from Dr. Duque regarding Plaintiff's disabilities, including MDD, GAD, PTSD, and ADHD diagnoses, and Plaintiff's accompanying need for the requested accommodations based on her disabilities.

53. At or about the same time as Plaintiff's request to the NBME, Plaintiff also notified Stritch personnel of the modification requests sent to the NBME.

54. The request for additional time was not an anomaly. In fact, documents provided by the NBME to assist students in their modification requests contained a "check-the-box" request for additional time.

55. Moreover, on information and belief, the NBME has granted students with disabilities additional time to take the Step 1 test as requested by Plaintiff.

56. Nevertheless, on or about July 15, 2021, the NBME denied the modification requests

but granted additional break time (as opposed to time to the test) in between each testing segment.

57. In response, on September 13, 2021, Plaintiff again sought a reasonable modification for additional time to take the test and affixed to her response an updated and more thorough medical evaluation from Dr. Duque.

58. At or about the same time as Plaintiff's second request to the NBME, Plaintiff again notified Stritch personnel of the modification requests sent to the NBME.

59. On or about September 24, 2021, the NBME once again denied Plaintiff's request for additional time.

**Plaintiff is Dismissed from Stritch.**

60. Beginning in late Fall of 2020 and continuing through 2021 Fall semester, a series of family tragedies befell Plaintiff. These included the death of the family matriarch, Plaintiff's maternal grandmother, and multiple hospitalization of Plaintiff's mother.

61. As a result, Plaintiff's disabilities took over Plaintiff's life affecting both her personal relationships and her academic performance.

62. Accordingly, the exacerbation of Plaintiff's conditions caused her to fail a pediatrics exam several times.

63. As a result, on or about February 15, 2022, Stritch dismissed Plaintiff from the program for poor academic performance.

**Stritch Sets Discriminatory Conditions upon Plaintiff's Readmission.**

64. On April 18, 2022, Plaintiff submitted a comprehensive thirty (30) page appeal of her dismissal.

65. Contained in the appeal was a detailed outline of Plaintiff's psychiatric illnesses, the

severe medication side effects Plaintiff had suffered, and a psychotropic genetic panel confirming the medical reasons for the severe side effects Plaintiff experienced while enrolled at Stritch.

66. Also included in Plaintiff's appeal was the letter Dr. Duque wrote to the NBME supporting Plaintiff's need for accommodations, the NBME's denial of accommodations letter, a detailed timeline of the psychosocial events Plaintiff suffered, Plaintiff's favorable clinical performance evaluations from her clerkships, and a detailed medication table that outlined the dates medications were started and the corresponding decline in academic performance.

67. On April 29, 2022, the Student Appeal Board reversed the dismissal and reinstated Plaintiff to Stritch.

68. In so doing, the Board recognized Plaintiff's success during Plaintiff's first two years at Stritch and felt that, based on its review, Plaintiff's "problems were directly due to your very serious family and health issues."

69. Nevertheless, despite the recognition that Plaintiff's disabilities contributed to her declining academic performance, the Board placed significant discriminatory stipulations upon Plaintiff's readmission including:

     a. a mandatory six-month sabbatical during which Plaintiff would focus on her mental health and be prohibited from engaging in any Step 1 activities including taking or studying for the Step 1 examination;

     b. a reevaluation in October of 2022 regarding Plaintiff's eligibility to begin studying for the Step 1 examination;

     c. upon return from her mandatory sabbatical, mandatory monthly meetings with the Associate Dean or Assistant Dean for Student Affairs to monitor her

academic progression as she prepared for her Step 1 examination;

d.  a requirement that Plaintiff work with and obtain instruction from Vera Schalansky, Director for the Academic Center for Excellence ("ACE"), throughout Plaintiff's Step 1 preparation;

e.  mandatory psychiatric therapy and counseling with compulsory progress reports provided to the Associate Dean or Assistant Dean for Student Affairs documenting her mental health and, most importantly;

f.   an eight (8) week maximum amount of time to study for her Step 1 exam with the stipulation that if Plaintiff fail her first attempt, which must be completed by the end of April of 2023, she would again be dismissed from Stritch without the opportunity to retake the examination or appeal the dismissal.

70. The stipulations for readmission imposed on Plaintiff, and in particular, the reduced study time for the Step 1 exam and stipulation of dismissal without appeal after only one failed test was not based on any pedagogical purpose.

71. Instead, the draconian stipulations which, on information and belief, had never been previously imposed on non-disabled students, were based on Plaintiff's disabilities and corresponding desire of Stritch to wash its hands of what they deemed to be a problematic and burdensome student.

72. Unfortunately for Plaintiff, the results would be predictable and as Stritch desired.

**Plaintiff Begins Preparing for Readmission to Stritch and the Step 1 Examination.**

73. While Plaintiff never formally acquiesced to the stipulations imposed upon her readmission, under extreme duress, and faced with the Hobson's choice provided by Stritch,

Plaintiff did her best to comply.

74. Nevertheless, no shrinking violet, Plaintiff continued to advocate for her rights and against the discriminatory conduct related to her readmission.

75. To that end, on May 2, 2022, Plaintiff emailed various Stritch personnel, including Viviana Martinez, Assistant Dean of the Office of Student Affairs, to complain of the discriminatory stipulations and her concerns that she was "being penalized for her medical illnesses."

76. Plaintiff never received a response to her objections to Stritch's disability discrimination.

77. On May 5, 2022, Plaintiff met with Senior Associate Dean of Student Affairs, James Mendez, to further complain about her treatment and the condition that she only be given a single chance to pass the Step 1 examination.

78. In response, Mr. Mendez deflected, claiming that the decision was that of the Board of Appeals and that there was nothing the Dean's Office could do to address the matter.

79. Over the course of the next several months, Plaintiff, to ameliorate the stress caused by Stritch 's conditions of readmission, continued to meet with Dr. Duque to address her disabilities.

80. In addition, and to further document the need for accommodations, Plaintiff, at significant personal expense, obtained a private neuropsychological evaluation performed by a clinical neuropsychologist.

81. The report confirmed Plaintiff's diagnoses of ADHD, PTSD, and MDD with anxious distress.

82. Moreover, the report noted that, due to Plaintiff's multiple disabilities and neurological

functioning, Plaintiff "likely always had had an anxious personality style that can be exacerbated by difficulties related to ADHD. Mrs. Santa's early experiences with trauma, symptoms of ADHD, and acculturation resulted in tremendous pressure and internalization of stress. This has led to significant symptoms of depression at various times throughout her life, reaching a crises state with the pressures of medical school and adverse experience with medication management."

83. Importantly, the report suggested that its findings "should be shared with her college/university academic and disability office to provide additional support and options for accommodations that may increase Mrs. Santa Maria's ability to perform well in school. Such accommodations may include … extended testing time (2x)."

84. In October of 2022, Plaintiff returned to Stritch and enrolled in an elective internship in her new field of study, psychiatry.

85. With the assistance of separate modifications granted to Plaintiff, Plaintiff would pass the internship "with honors."

86. Despite establishing that, with reasonable modifications, Plaintiff could be an "honors" student, Plaintiff would continue to suffer from the Defendants' discriminatory conduct.

**Plaintiff is Again Denied a Reasonable Modification by the NBME.**

87. In October of 2022, at about the same time Plaintiff returned from her mandatory sabbatical, Plaintiff once again made a formal request for accommodations with the NBME seeking additional testing time, a private room to take the test, and access to snacks and water.

88. As she had done previously, Plaintiff's request was accompanied by documentation from Dr. Duque regarding Plaintiff's disabilities, including diagnoses of MDD, PTSD, GAD and ADHD, and Plaintiff's accompanying need for the requested accommodations based on

her disabilities.

89. Also accompanying Plaintiff's request was the neuropsychological evaluation suggesting accommodations including "extended testing time (2x)."

90. As with her previous request, the request for additional time was not an anomaly. In fact, documents provided by the NBME to assist students in their modification requests contained a "check-the-box" request for additional time.

91. On information and belief, the NBME has granted students with disabilities additional time to take the Step 1 test as requested by Plaintiff.

92. Moreover, the extra time requested would not have fundamentally altered the nature of the services provided by the NBME.

93. In fact, prior to denying Plaintiff the extra time requested, the NBME, pursuant to the ADA, had been court-ordered to provide extra test time to medical students with similar disabilities taking the Step examinations.

94. At or about the same time as Plaintiff's second request to the NBME, Plaintiff again notified Stritch personnel of the modification requests sent to the NBME.

95. On January 10, 2023, the NBME granted Plaintiff her request for access to a snack and water and a private room to take the test

96. Importantly, however, as it had done previously, the NBME denied Plaintiff's request for extra testing time despite the suggestion of the neuropsychological evaluation.

97. This denial was particularly damaging to Plaintiff's prospects.

98. Specifically, while Plaintiff is highly intelligence, per her neuropsychological evaluation, Plaintiff's maladies and psychological stressors exacerbated her "low Average working memory capacity" which included abnormal functionalities in thinking, attention,

processing speed, and thought sequencing, particularly while under stress.

99. As a result, the reasonable modification of additional time, specifically suggested by both Plaintiff's board-certified psychiatrist, Dr. Duque, and Plaintiff's neuropsychological evaluation, would have provided Plaintiff equal access to the Step 1 examination.

100.    Nevertheless, although disappointed by NBME's refusal to provide a reasonable modification, Plaintiff, upon receipt of the NBME's January 10, 2023, letter and accompanying testing permit, emailed the documents to Stritch personnel including Senior Associate Dean of Student Affairs, James Mendez.

101.    Importantly, because the Step 1 test was to be administered over two full days, the testing permit directed that Plaintiff have from February 1, 2023, until April 30, 2023, to complete both portions of the exam, with a fourteen day break in-between the two daily sessions of the examination.

102.    The fourteen-day break in between the daily sessions is provided only to students that have applied for reasonable modifications.

103.    However, through the actions of Stritch, Plaintiff would not be able to avail herself of this particularly important benefit.

**Stritch Takes Further Steps to Undermine Plaintiff's Success.**

104.    On January 18, 2023, in accordance with the readmission stipulation that Plaintiff undergo a mandatory maximum supervised study period of eight weeks, Plaintiff emailed Stritch personnel to set up a meeting to discuss her study plan.

105.    In response, Plaintiff was told that Dean Mendez was a necessary party to the meeting and would not be available for at least several weeks.

106.    Shortly thereafter the meeting was scheduled for February 8, 2023.

107.     This delay in setting up the initial "study plan" meeting would cause Plaintiff significant difficulty and work to further undermine her success.

108.     In fact, due to Stritch's delay in scheduling the meeting, combined with Stritch's insistence that Plaintiff's Step 1 examination be completed by the end of April, Plaintiff, in order to take full advantage of the maximum eight-week period of study, would not be able to take the first day's examination until late April with the second examination day occurring only several days later.

109.      As a result, Plaintiff would not be able to take advantage of the two-week break in between day one and day two of the exam as allowed by the NBME.

110.     Instead, Plaintiff would eventually take the first portion of the exam on April 26, 2023, with the following portion taken on April 29, 2023.

111.     Based on Stritch's insistence that Plaintiff would be dismissed from the program after only one failed attempt, Plaintiff's anxiety and PTSD leading up to the examination began to significantly worsen.

112.     In fact, Plaintiff's attending psychiatrist, Dr. Duque, attributed Plaintiff's deteriorating condition and renewed onset of PTSD to Stritch 's insistence that Plaintiff only be given one chance to pass the Step 1 examination and do so without the modification grating Plaintiff extra time.

113.     As a result, in the weeks leading up to the April 26, 2023, exam date Dr. Duque had to increase Plaintiff's antidepressant dose to combat acute stress induced symptoms.

114.     This was the first time in over a year that Plaintiff's psychiatric symptoms necessitated medication changes.

115.     In addition, on April 20, 203, only six days before the first day of examination,

Dr. Duque had to prescribe additional medication for severe and acute anxiety and panic attacks.

116.     Despite the increased medications, Plaintiff's symptoms did not abate but instead continued to worsen.

117.     Not only did Stritch's conditions on readmission exacerbate Plaintiff's conditions, but so too did its failure to assist Plaintiff in her Step 1 preparation.

118.     In fact, despite imposing discriminatory terms upon Plaintiff' readmission, Stritch failed to adhere to its own stipulations by:

    a.  failing to provide Plaintiff the monthly Step 1 progress study meetings with Dean Mendez; and

    b.  failing to provide Plaintiff any study guides, plans or other learning tools to assist Plaintiff in her preparation for the Step 1 examination, including the failure of ACE to provide Plaintiff an updated "First Aid Study Guide" provided to all students in preparation for their STEP 1 examination.

119.     In addition, among the Step 1 preparation services that ACE could have provide Plaintiff but did not included advanced study strategies and plans, individual advising, memory training, peer tutoring, test-taking strategies, time management skills, and various workshops designed to enhance Plaintiff's chances of success.

120.     In fact, other than a thirty-minute perfunctory meeting during which it was suggested that Plaintiff purchase, at her own expense, additional Step 1 examination questions to practice with, Stritch made no substantive efforts to assist Plaintiff in her studies as they promised.

121.     Stritch's failure to provide these services was in stark contrast to the assistance

provided to its non-disabled students who received many of these services.

122.     On April 26, 2023, and April 29, 2023, Plaintiff completed her first attempt at the Step 1 examination as scheduled.

123.     During the examination, Plaintiff's maladies, exacerbated by the conditions Stritch imposed on her, and the NBME's refusal to provide extra time, negatively affected her functionalities in thinking, attention, processing speed, and thought sequencing thereby significantly impacting her ability to take the test.

124.      While Plaintiff would have to wait several months for her scores, the results would be predictable.

**Stritch Dismisses Plaintiff for Failing the Step 1 Examination.**

125.     Upon completion of the Step 1 examination, and at the urging of Dr. Duque, on June 14, 2023, Plaintiff sent an email to Dean Mendez to share her concerns with the way she was treated by Stritch, her continued objections to Stritch 's conditions for readmission, and the adverse effects she suffered as a result.

126.     Plaintiff received no response.

127.     Shortly thereafter, Plaintiff was notified that she had failed her first and only attempt at the Step 1 examination.

128.     Upon receiving notice that she failed the Step 1 examination, Plaintiff again emailed Dean Mendez to object to her treatment and seek a reevaluation of her readmission requirements, including the condition that she only be granted a single attempt at the Step 1 examination.

129.     Still having received no response from Dean Mendez or any other Stritch personnel regarding her complaint, Plaintiff filed disability discrimination complaints with the

Department of Justice Civil Rights Division on June 21, 2023, and the U.S. Department of Education's Office of Civil Rights on June 23, 2023.

130.     One day later, on June 24, 2023, Dean Mendez finally responded to Plaintiff's emails informing Plaintiff that he would set up a meeting to "discuss what happened."

131.     Several weeks later, on July 17, 2023, administrative personnel finally emailed Plaintiff to set up a meeting with Dean Mendez.

132.     Only after Plaintiff inquired as to whether legal counsel could assist her was Plaintiff informed that the purpose of the "meeting" was not to discuss her complaint but instead to simply "hand you and discuss the final dismissal letter."

133.     On July 28, 2023, Plaintiff was emailed her dismissal letter from Dean Mendez informing Plaintiff that, due to her failing the Step 1 examination, Plaintiff's "readmission is hereby rescinded under the terms of the April 29, 2022, reinstatement."

134.     As outlined in Stritch April 29, 2022, reinstatement letter, Plaintiff's dismissal was final and non-appealable.

135.     At the time of Plaintiff's dismissal, Plaintiff had already begun taking some of her fourth and final year elective courses and was on pace to graduate with her Doctor of Medicine at the conclusion of her fourth year.

136.     In addition, at the time Plaintiff was dismissed from Stritch, Plaintiff was complying with all obligations required of her by the Stritch School of Medicine's Academic Policy Manual, as well as all other stipulations imposed upon her readmission to Stritch.

137.     To date, Stritch has failed to address in any substantive way the disability discrimination Plaintiff endured and has failed to provide Plaintiff any of the procedural rights and procedures promised to Plaintiff in its policy manual.

138.     As a result of the University's actions, Plaintiff has suffered significant injury including, but not limited to, a denial of the opportunity to complete her Doctor of Medicine, loss of considerable sums of money in tuition and related expenses, a delay in entering the profession of her choosing, a loss in reputation and ability to transfer to other medical programs, and extreme embarrassment and emotional distress including, but not limited to, anxiety, insomnia, and feelings of isolation and depression.

### COUNT I
**Title III of the Americans with Disabilities Act**
**Discrimination**
**(Against Stritch and the NBME)**

139.     Plaintiff realleges and incorporates each paragraph as stated herein.

140.     As described more fully herein, Plaintiff was denied the full benefits of the services, programs, and activities provided by the Defendants and was otherwise subjected to discrimination because of her disability.

141.     As a result of the Defendants' actions, Plaintiff was injured.

### COUNT II
**Title III of the Americans with Disabilities Act**
**Retaliation**
**(Against Stritch)**

142.     Plaintiff realleges and incorporates each paragraph as stated herein.

143.     As described more fully herein, Plaintiff was retaliated against due to her opposition to acts and practices made unlawful by the ADA.

144.     As a result of Defendant's actions, Plaintiff was injured.

### COUNT III
**Section 504 of the Rehabilitation Act**
**Discrimination**
**(Against Stritch and the NBME)**

145.     Plaintiff realleges and incorporates each paragraph as stated herein.

146.     As described more fully herein, Plaintiff was denied the full benefits of the

services, programs, or activities provided by the Defendants and was otherwise subjected to

discrimination because of her disability.

147.     As a direct result of the Defendants' actions, Plaintiff was injured.

**Count IV**
**Section 504 of the Rehabilitation Act**
**Retaliation**
**(Against Stritch)**

148.     Plaintiff realleges and incorporates each paragraph as stated herein.

149.     As described more fully herein, Plaintiff was retaliated against due to her

opposition to acts and practices made unlawful by the Rehabilitation Act.

150.     As a direct result of the Defendant's actions, Plaintiff was injured.

**COUNT V**
**Breach of Implied-in-Fact Contract**
**(Against Stritch)**

151.     Plaintiff realleges and incorporates each paragraph as stated herein.

152.     As described more fully herein, the conduct of the parties gave rise to an

implied-in-fact contract that Stritch materially breached by failing to comply with its

contractual obligations.

153.     Defendant's actions were arbitrary, capricious, and undertaken in bad faith.

154.     As a result of Defendant's actions, Plaintiff was injured.

**COUNT VI**
**Intentional Infliction of Emotional Distress**
**(Against Stritch)**

155.     Plaintiff incorporates each paragraph of this Complaint as stated herein.

156.     As described more fully herein, intending that its conduct would cause severe

emotional distress, or knowing that there was a high probability that its conduct would cause severe emotional distress, Stritch engaged in conduct that caused severe emotional distress to Plaintiff.

157.     As a result of Defendant's actions, Plaintiff was injured.

## COUNT VII
**Negligence**
**(Against Stritch)**

158.     Pleading in the alternative to the intentional conduct alleged, and as described more fully herein, Stritch owed Plaintiff a duty to ensure and safeguard her rights in accordance with its policies and procedures.

159.     As described more fully herein, Stritch breached its duty by disregarding Plaintiff's rights and dismissing her from program.

160.     As a result of Defendant's actions, Plaintiff was injured.

*Wherefore*, Plaintiff requests that this Court enter a judgment in her favor and against Defendants, enter an order reinstating Plaintiff to the University of Chicago Stritch School of Medicine conferring to Plaintiff all rights granted to non-disabled students, including the right to take the Step 1 examination three times before dismissal, expunge any reference to Plaintiff's dismissal for failing the Step 1 examination, enter an order directing the National Board of Medical Examiners to grant Plaintiff the accommodations sought including extra testing time, award compensatory damages, punitive damages, attorney's fees, costs, and any other relief this Court deems just.

**<u>Jury Trial Demanded</u>**

Plaintiff hereby demands a trial by jury on all issues so triable.


Respectfully submitted,


*T. Andrew Horvat*
Attorney for Plaintiff


*/s/ T. Andrew Horvat*
Horvat Law, LLC
155 N. Wacker Drive, Suite 4250
Chicago, IL 60606
312-803-4956
andrew@horvatlawllc.com
ARDC No, 6277684