**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JOHANA SANTA MARIA,       )
                                 )
         Plaintiff,         )
                                 )     No. 24 C 1698
       v.                )
                                 )     Judge Sara L. Ellis
LOYOLA UNIVERSITY OF CHICAGO   )
STRITCH SCHOOL OF MEDICINE and THE  )
NATIONAL BOARD OF MEDICAL     )
EXAMINERS,                   )
                                 )
        Defendants.      )

## OPINION AND ORDER

Plaintiff Johana Santa Maria, a former medical student at Loyola University of Chicago Stritch School of Medicine ("Stritch"), sued Stritch and The National Board of Medical Examiners ("NBME," and collectively, "Defendants") for allegedly discriminating against her by dismissing her from medical school and denying her reasonable accommodations when sitting for a critical examination. NBME answered Santa Maria's complaint, Doc. 16, and the Court granted in part and denied in part Stritch's motion to dismiss, Doc. 48. The Court now considers Santa Maria's motion for a preliminary injunction, in which she requests (1) immediate reenrollment at Stritch; (2) full restoration of all credits she previously earned as a student at Stritch; and (3) full restoration of "all rights consistent with [her] peers . . . including the right to take the Step 1 examination three additional times before dismissal, [and] the right to appeal her dismissal . . . should [that] potentially occur." Doc. 28 at 30. The parties submitted briefs, supplemental exhibits, and participated in a preliminary injunction hearing on November 19, 2024. After considering the evidence, the Court denies Santa Maria's motion because she is

unlikely to succeed on the merits of her claims and because an injunction would not relieve her irreparable injury.

**BACKGROUND[1]**

**I.      Overview of Stritch's Policies and a Medical Student's Journey into the Profession**

Becoming a fully licensed doctor in the United States is an arduous process.  Entrants to a medical school such as Stritch must first have a four-year undergraduate degree and have taken courses in biology, chemistry, and other physical sciences.  Once enrolled, students must successfully complete two years of classroom-based learning before transitioning to two years of clinical courses, called clerkships, that provide experiential training across certain core specialties of medicine.  Stritch's Academic Policy Manual limits students' ability to fail these third- or fourth-year clerkships: it states that if "an F grade is reported for a third required or elective clerkship, the student is automatically dismissed by administrative action of the Stritch School of Medicine."  Doc. 28-3 at 36.

At points throughout medical school, students must pass certain exams that NBME administers nationally.  Students usually take these three exams, colloquially known as Step 1, Step 2, and Step 3, between years 2 and 3 of medical school, close to the end of medical school, and during their first year of residency, respectively.  Step 1, the only exam relevant to this case, assesses the knowledge a student learns during the first two years of medical school.

Stritch's Academic Policy Manual provides students with detailed procedures in the event they fail Step 1 once and subsequent times.  A student who fails Step 1 on her first attempt must "meet with the Office of Student Affairs ["OSA"] and the Academic Center for Excellence ["ACE"] to establish a preparation plan for a second attempt."  *Id.* at 18.  If a student fails a

---

[1] The Court takes the facts in this background section from the parties' briefs, supporting exhibits, and the evidentiary hearing held on November 19, 2024.

2

second time, she must "meet with ACE and OSA to determine a study plan for a third attempt." *Id.* at 19. The Academic Policy Manual notes that students "who must prepare for a second or third attempt will most likely have to delay their completion date and Match participation year." *Id.* Ultimately, "[f]ailure of a third attempt on USMLE Step 1 results in an academic dismissal from [Stritch]." *Id.*

During a student's fourth year of medical school, after he or she has taken and successfully passed Step 1, the student will apply for and most likely gain admission to a residency program to receive additional training in a specific medical specialty such as family medicine, surgery, or pediatrics. Successfully completing a residency program is a necessary condition for a doctor to receive a medical license that allows him or her to independently practice medicine within their specialized field. A student with ambitions to become a fully licensed doctor will devote at least a decade of her life to this pursuit.

## II.    Santa Maria's Experiences at Stritch

Santa Maria was and still is one of those ambitious people who wants to become a doctor. Her life's passion is the laudable goal of providing psychiatric care to underserved communities like the one in which she grew up. To accomplish this goal, she matriculated to Stritch on July 30, 2018. Santa Maria successfully passed all her classes her first two years at Stritch and was on track to sit for the pivotal Step 1 exam in the Spring of 2020. However, like many aspects of almost everyone's lives, the Covid-19 pandemic disrupted Santa Maria's normal progression through Stritch's curriculum. In response to the sweeping uncertainty the global health crisis provoked, Stritch temporarily waived its requirement that students take and pass Step 1 before commencing clinical courses in their third year. Santa Maria delayed her exam in accordance with the amended policy.

Throughout her first two years at Stritch and continuing to the present, Santa Maria suffered from Major Depressive Disorder ("MDD"), Post-Traumatic Stress Disorder ("PTSD"), General Anxiety Disorder ("GAD"), and Attention-Deficit Hyperactivity Disorder ("ADHD"). To treat these conditions, Santa Maria received both psychiatric (medical) and psychological (talk therapy) treatment from Dr. Kimberly Duque, the (now former) Director of Stritch's Residency Wellness Program. As Dr. Duque testified, Santa Maria suffered from symptoms including flashbacks to traumatic events, inability to control feelings of worry, sleep disturbance, reduced information processing and decision making, and overall lower executive functioning. Dr. Duque testified that Santa Maria's mental conditions worked "like a Venn diagram," meaning that if Santa Maria experienced one symptom of one condition, such as sleep disturbance, then that could trigger additional symptoms of other disorders. Tr. at 14:4. At several points during Santa Maria's time at Stritch, particularly during her mother's hospitalization in December 2020 and her grandmother's transition to hospice care and later death in the Spring and Summer of 2021, these disorders would hamper her ability to perform necessary tasks for her education, including attending shifts, passing exams assessing clinical knowledge, and studying for Step 1.

To mitigate the impact of her mental health on her studies, Santa Maria requested several accommodations from Stritch that would allow her to take exams under conditions more favorable to her disabilities. As of 2019, Santa Maria was receiving access to "a private room, [and] access to food and water." *Id.* at 79:8–9. Then, later during Santa Maria's second year, she received "exam extensions," which provided her with "extra time to study" but not with additional time to take the exams themselves. *Id.* at 79:11. Santa Maria did not receive additional time to take exams until September 2021, despite having emailed Director/Academic

4

Support Advisor Vera Schalansky, one of the administrators at Stritch who could grant testing accommodations, about requesting additional time for her family medicine clerkship exam in March 2021.[2]  *See* Doc. 68-1 at 3, 11.  Santa Maria testified that Stritch's system of granting and tracking accommodations was decentralized: she would "read through every single email [she] had ever sent with the administration, and [her set of accommodations] was randomly embedded in different email threads for different clerkships."  Doc. 82:16–19.

Even with these accommodations, Santa Maria struggled with passing her clerkships.  At Stritch, each clerkship grade consists of a weighted component of (1) a written exam, (2) an objective structured clinical exam ("OSCE"),[3] (3) clerkship performance as assessed by resident supervisors, and (4) miscellaneous clerkship-by-clerkship components such as presentations about subject matter-specific medical issues.  *See, e.g.*, Doc. 65-1 at 2–3 (Santa Maria's surgery clerkship transcript).  For example, Santa Maria's surgery clerkship assigned the written exam a weight of 40% of the final grade; the OSCE received 15%; her clinical performance was worth 40% split across two units; and her presentation was worth 10%.  *See id.* at 2.  To pass her surgery clerkship, Santa Maria had to fulfill two requirements: one, she had to receive a cumulative weighted score of at least 64.1%; two, she had to pass her written examination.  Thus, although Santa Maria's final weighted score was 65.27%, she did not complete the clerkship because she "[f]ailed the NBME surgery [written] exam with a very low score of 41."

---

[2] On August 8, 2021, Dr. Duque submitted a letter to NBME on Santa Maria's behalf to obtain accommodations that stated that Santa Maria had been receiving "Time and half to complete her exam[s]" since she arrived at Stritch.  Doc. 42 at 188.  According to Santa Maria's testimony and Ms. Schalansky's emails, however, Dr. Duque's report to NBME was factually incorrect.

[3] As Dr. Duque testified, the OSCE is a "practical [exam] where . . . students interact with actors . . . that are presenting with clinical diagnoses . . . so that they are able to test theoretically how, somebody, a medical student, may handle that particular medical problem if it was presenting in real life."  Tr. at 34:10–15.

*Id.* Santa Maria received an "unsatisfactory" instead of a "fail" for her surgery clerkship on her score report because she still had two opportunities to remediate her written exam. *See id.* While Santa Maria sat for her first surgery exam before she received the accommodation of extra time on exams, she still failed her second attempt to pass her surgery written exam despite having the benefit of the extra time accommodation. Santa Maria did not have the opportunity to take the exam a third time before Stritch dismissed her for failing her pediatric written exam three times.

Santa Maria's performance in her other clerkships broke down as follows:

- Medicine: Santa Maria earned a passing weighted score but received an unsatisfactory due to failing her written exam without the accommodation of extra time. Santa Maria then passed the written exam on her second attempt, also without the accommodation of extra time. *Id.* at 5–6.

- Family Medicine: Santa Maria earned a passing weighted score and passed her written exam on her first attempt without the accommodation of extra time. *Id.* at 7.

- Pediatrics: Santa Maria earned a passing weighted score but received an unsatisfactory due to failing her written exam without the benefit of extra time. Santa Maria failed her second written exam, also without the accommodation of extra time. Santa Maria then received the accommodation of extra time on her third attempt, but subsequently failed her third written exam. *Id.* at 8–9.

- Psychiatry: Santa Maria earned a passing weighted score and passed her written exam on her first attempt without the accommodation of extra time. *Id.* at 10–11.

- Obstetrics and Gynecology: Santa Maria did not earn a passing weighted score and failed her written exam on her first attempt with the accommodation of extra time. Santa Maria did not sit for a remedial exam before her first dismissal from Stritch. *Id.* at 12–13.

Stritch dismissed Santa Maria on February 15, 2022, in accordance with the Academic Policy Manual after she failed her pediatrics written exam for a third time. *See* Doc. 28-5 at 2. Stritch's Dean, James Mendez, stated that it is "virtually unprecedented for any medical student at Stritch to have this many failed clerkship exams at the exact same time." Doc. 42 at 43, ¶ 12.

Santa Maria applied for reinstatement after receiving her dismissal letter. On April 20, 2022, she met with the Student Appeal Board ("SAB") to explain why it should reinstate her despite her academic shortcomings. The SAB ultimately agreed to allow Santa Maria to reenroll at Stritch. In its reinstatement letter, the SAB wrote that it "felt that [her] problems were directly due to [her] very serious family and health issues. The SAB also felt that [she] [was] very serious about listening to and working with [her] healthcare team to improve [her] overall health and decision making." Doc. 28-6 at 2.

However, the SAB attached conditions to Santa Maria's reinstatement. These conditions included:

- A six-month to one-year leave of absence where Santa Maria could only enroll in research electives. The SAB specifically required Santa Maria to "disconnect from any Step 1 exam or clerkship activities and focus on getting healthy." *Id.*

- A mandatory eight-week study period after starting preparations for Step 1.

- Only one attempt to pass Step 1.

- Monthly meetings with the Associate or Assistant Dean for Student Affairs to "monitor [Santa Maria's] progression as [she] prepare[d] for [her] next exam attempt." *Id.*

Santa Maria attempted to challenge some of these requirements. In an email she sent on May 2, 2022 to Dean Mendez, Ms. Schalansky, and others, she asked who would determine the criteria for whether she would take a six-month or one-year leave of absence and wrote that it did "not sit well with [her]" that her failure to strictly comply with the SAB's reenrollment

7

conditions would lead to her "automatically be[ing] dismissed by Stritch without the option of appeal." Doc. 28-7 at 2. Santa Maria did not protest any other conditions in her email, although she testified during the preliminary injunction hearing to her subjective belief that she was challenging all the conditions of reenrollment when she sent the email.

On May 5, 2022, Santa Maria and Dean Mendez met to discuss the reenrollment letter. Santa Maria testified that she felt like she did not have the chance to challenge the other conditions of reinstatement during the meeting and admits that she never explicitly raised the requirement that she pass Step 1 on her first attempt. Santa Maria ultimately signed the reinstatement letter without formally appealing the SAB's decision or conditions and commenced her leave of absence. Santa Maria returned to Stritch in October 2022.

Santa Maria requested several accommodations from NCBE for her lone attempt at Step 1. Although NCBE ultimately denied her double-time to take both days of the exam, it granted her access to food and water while taking the test and allowed her a maximum fourteen-day break between her first and second days of the exam. Her testing permit allowed her to sit for the exam any time between February 1, 2023, and April 30, 2023.

Santa Maria met with Ms. Schalansky in January 2023 to make a study plan. Ms. Schalansky provided Santa Maria with several study resources to prepare her to take the exam. In addition to these resources, Santa Maria prepared for Step 1 using a set of approximately 5,000 flashcards she created during her first two years at Stritch using an algorithm to help her retain information that challenged her.

Santa Maria also met with Dean Mendez on February 8, 2023, to discuss her study progress. Santa Maria testified that she discussed with Dean Mendez if she could postpone the exam past April 2023 in order to appeal NBME's denial of her double-time accommodation, but

that Dean Mendez told her that the SAB's deadline was firm. Dean Mendez denied at the preliminary injunction hearing that Santa Maria objected to this condition during their meeting. On February 9, 2023, Santa Maria emailed Dean Mendez, Ms. Schalansky, and others to confirm that she would sit for the exam by April 2023. Santa Maria testified that Dean Mendez instructed her to write this email, but Dean Mendez denied giving Santa Maria any such instruction "because it wasn't necessary" due to Santa Maria already knowing of the condition from the SAB. Tr. at 238:7.

Santa Maria's mental health declined in the lead-up to her first testing date of April 26, 2023. She met with Dr. Duque on March 15, 2023, to discuss her increased anxieties about her only attempt to pass Step 1 and to change her medication regimen to address her symptoms. Sometime between March 1, 2023 and March 15, 2023—that is, before Dr. Duque's meeting with Santa Maria—Dr. Duque called Dean Mendez. Dr. Duque and Dean Mendez offer slightly different, but compatible, versions of this conversation. Dr. Duque says that she asked Dean Mendez if he could change the SAB's condition that Santa Maria must pass Step 1 on her first attempt, but that he said the condition "was set in stone. It was non-negotiable." *Id.* at 64:16. Dean Mendez did not testify as to the specific contents of their phone call, but he denied discussing changes in Santa Maria's health conditions due to Step 1, changes in Santa Maria's medication, or Santa Maria's side effects from taking medication. Dean Mendez further testified that if he learned about Santa Maria's medication changes and declining mental health then he would have allowed Santa Maria additional time to take Step 1.

Santa Maria took her first day of Step 1 on April 26, 2023, and sat for the second day of the exam on April 29, 2023. Santa Maria learned that she failed the exam on June 14, 2023.

That morning, hours before receiving her score, Santa Maria emailed Dean Mendez to object to her readmission requirement that she pass Step 1 on her first attempt.

On June 24, 2023, Dean Mendez offered to meet with Santa Maria to discuss her Step 1 failure and her dismissal from Stritch. Santa Maria requested that her legal counsel also attend the meeting, but Dean Mendez denied this request. After she learned she could not bring an attorney, Santa Maria asked Dean Mendez to email her the dismissal letter in lieu of a meeting, which he did on July 28, 2023. The letter makes her "dismissal from Stritch [] final and effective [as of] June 14, 2023." Doc. 28-11 at 2. When Santa Maria left Stritch, her grades placed her "in the lower third of her medical school class." Doc. 42 at 51, ¶ 45.

## LEGAL STANDARD

A preliminary injunction is "an extraordinary and drastic remedy" demanding the movant "by a clear showing, carr[y] the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). "The purpose of a preliminary injunction is to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, (1981). "To obtain a preliminary injunction, a plaintiff must show that (1) [s]he has some likelihood of success on the merits of [her] claim; (2) traditional legal remedies are inadequate; and (3) [s]he would suffer irreparable harm without preliminary injunctive relief." *Finch v. Treto*, 82 F.4th 572, 578 (7th Cir. 2023). If the movant satisfies these initial factors, the Court weighs the harm the non-movant will suffer if it grants preliminary relief against the irreparable harm the movant may suffer in its absence. *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021). The Court also factors in the "consequences of granting or denying the injunction to non-parties." *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 11–12 (7th Cir. 1992). "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in [her] favor; the

less likely [s]he is to win, the more need it weigh in [her] favor." *Valencia v. City of Springfield*, 883 F.3d 959, 966 (7th Cir. 2018).

## ANALYSIS

### I.    Likelihood of Success on the Merits

To win injunctive relief, "a plaintiff must demonstrate that '[her] claim has some likelihood of success on the merits,' not merely a 'better than negligible' chance." *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020) (quoting *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381 (7th Cir. 2018)).  To do so, a plaintiff must make a strong showing of success.  *Nken v. Holder*, 556 U.S. 418, 434 (2009).  However, a "strong" showing is not "proof by a preponderance . . . [because] that would spill too far into the ultimate merits for something designed to protect both the parties and the process while the case is pending.  But it normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020).

Santa Maria's claims that are eligible for injunctive relief all arise under the ADA and the Rehabilitation Act.  Under both statutes, she must show that "(1) [she] is a qualified person (2) with a disability and (3) [Stritch] denied [her] access to a program or activity because of [her] disability." *Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015).  Although the analysis under both the ADA and the Rehabilitation Act is "functionally identical," *id.*, the Rehabilitation Act "has a stricter causation requirement," *Conners v. Wilkie*, 984 F.3d 1255, 1260 (7th Cir. 2021).  Under the Rehabilitation Act, "the plaintiff's disability must be the *sole* reason for the alleged discriminatory action," while the ADA only requires the disability to be "*a* reason for the challenged action." *Id.*  Santa Maria "can satisfy both causation requirements by [showing] any of the following: '(1) [Stritch] intentionally acted on the basis of the disability, (2) [Stritch]

refused to provide a reasonable modification, or (3) [Stritch's] rule disproportionally impacts disabled people.'" *Haney v. Pritzker*, 563 F. Supp. 3d 840, 859 (N.D. Ill. 2021) (quoting *A.H. by Holzmueller v. Ill. High Sch. Ass'n*, 881 F.3d 587, 592–93 (7th Cir. 2018)). Because both parties agree that Santa Maria's diagnoses qualify as disabilities for the purposes of the ADA and the Rehabilitation Act, the Court's analysis focuses on Santa Maria's qualifications and likelihood that she can show that her disability caused Stritch's alleged discrimination. Although the Court agrees that Santa Maria will likely demonstrate that Stritch discriminated against her on the basis of her disability,[4] because the record shows that she is unlikely to successfully prove that she is otherwise qualified, the Court finds that she is ultimately unlikely to succeed on the merits of her claims.

Santa Maria is unlikely to prove that she "is a qualified person" within the meaning of the ADA and the Rehabilitation Act. *Lemmon*, 778 F.3d at 592. "In the context of a university, a person is 'otherwise qualified' if she is able to meet all of the program's requirements in spite of her disability, with or without a reasonable accommodation." *Khan v. Midwestern Univ.*, 879 F.3d 838, 844 (7th Cir. 2018) (quoting *Knapp v. Nw. Univ.*, 101 F.3d 473, 482 (7th Cir. 1996)). "Academic decisions, such as whether a student is qualified for, or entitled to promotion within a program, must be left to the broad discretion of the academic institution." *Id.* (citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225–26 (1985)). "Academic institutions are in no way exempt from our discrimination laws. Nor are there separate and more lenient standards for them. But, when assessing the evidence in such cases, courts must understand the nature and

---

[4] Because SAB expressly recognized Santa Maria's disability as one of the reasons for its decision to readmit her, she is at least likely to show that her disability was a "but for" cause of the stricter readmission conditions it imposed on her. *Washington v. Ind. High Sch. Athletic Ass'n*, 181 F.3d 840, 849 (7th Cir. 1999) (but for discrimination found when witness "stated that Mr. Washington's learning disability caused him to fail at school . . . and, without the learning disability, [he] would be fully capable of performing in high school").

mission of the institutions and evaluate the evidence accordingly." *Novak v. Bd. of Trs. of S. Ill. Univ.*, 777 F.3d 966, 976 (7th Cir. 2015). Notably, when a school exercises its discretion to readmit an academically-dismissed student, that "second chance [does] not erase her prior record." *Khan*, 879 F.3d at 845; *Nehme v. Fla. Int'l Univ. Bd. of Trs.*, 121 F.4th 1379, 1384 (11th Cir. 2024).

Here, the record contains evidence of Santa Maria's academic deficiencies such that it is difficult for the Court to find that she is likely to show that she can "meet all of [Stritch]'s requirements in spite of her disability, with or without a reasonable accommodation." *Khan*, 879 F.3d at 844. Santa Maria's exam record speaks for itself: she failed her pediatrics clerkship exam three times, her surgery clerkship exam twice, and her OB/GYN clerkship exam once before Stritch initially dismissed her from medical school. When Santa Maria took these exams, she did so with the benefit of accommodations ranging from additional time to prepare for exams, to a private exam setting, to (after September 2021) additional time on the exams themselves.[5] Given these facts, Stritch operated well within its discretion when it dismissed Santa Maria in accordance with the Academic Policy Manual for poor academic performance on February 15, 2022. The fact that it then chose to readmit her after she appealed to the SAB "did not erase her prior record but allowed her to prove that she could be successful going forward." *Id.* at 845. Stritch's method of choice to allow Santa Maria to prove her future success was requiring her to pass Step 1 on her first attempt. Although this may not have been the most

---

[5] Troublingly, Stritch failed to extend Santa Maria the accommodation of extra time to sit for her exams until September 2021. Ms. Schalansky was on notice of Santa Maria's belief that she needed additional time to sit for exams at least as early as March 22, 2021, in the context of Santa Maria's application for extra time to NBME. *See* Doc. 68-1 at 2. Despite this, Ms. Schalansky did not ask Santa Maria if she wanted extra time for Stritch-administered exams until September 9, 2021. *See id.* at 10. Because Santa Maria disclaims that she brings claims arising from Stritch's conduct before her first dismissal from the school, this oversight does not impact the Court's analysis; it is, however, exemplary of the haphazard approach Stritch took to granting and tracking student accommodations during the relevant period.

reasonable or optimal way for Santa Maria to demonstrate her academic fitness, the Court cannot say that it was an abuse of the "broad discretion of the academic institution." *Id.* at 844; *see also Ewing*, 474 U.S. at 225 n.11 (1985) ("University faculties must have the widest range of discretion in making judgments as to the academic performance of students and their entitlement to promotion or graduation." (citing *Bd. of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. 78, 96 n.6 (1978) (Powell, J., concurring))); *Novak*, 777 F.3d at 976 ("[A]cademic judgments often rest on necessarily subjective judgments about academic potential."); *cf. Anderson v. Univ. of Wis.*, 841 F.2d 737, 741 (7th Cir. 1988) ("The [ADA and Rehabilitation] Act do[] not designate a jury, rather than the faculty of the Law School, as the body to decide whether a would-be student is up to snuff.").

Santa Maria's arguments that she is likely to demonstrate that she is qualified to resume studying at Stritch in spite of her exam record lack evidentiary and legal support. At the preliminary injunction hearing, Santa Maria's counsel placed significant emphasis on Santa Maria's relatively high performance on her OSCE exams, her generally positive reviews from residents who qualitatively assessed her clerkship performance, her overall composite scores for each of her clerkships, and her creation of approximately 5,000 flashcards to use as study aides. Although these facts show that Santa Maria was clinically adept, personable, and studious, they have no ultimate bearing on whether she was or would be able to satisfy Stritch's generally applicable requirements for its students. This Court cannot ignore Stritch's judgment that the best way to assess a doctor's subject matter ability is to require them to pass written exams for each clerkship. *See Khan*, 879 F.3d at 845. Santa Maria's three failures in her pediatrics clerkship were sufficient for Stritch to dismiss her, and her other clerkship exam failures—even when she received accommodations—provide additional evidence that she is not qualified to

continue her studies at Stritch. *See id.* at 847 ("Allowing Khan a second chance to take her first year medical school courses again did not make her qualified for the program. She was still unqualified under the policy of the school; the school simply allowed an unqualified student a chance to prove herself qualified going forward. Khan was unable to do so."); *Nehme*, 121 F.4th at 1384 ("Nehme seems to think that because the school tolerated his failures for several years, it was legally obligated to keep doing so. But the law does not require medical schools to retain students who cannot perform the coursework, and neither will we.").

Ultimately, the Court cannot find that Santa Maria is likely to show that she is qualified to continue her studies at Stritch without disturbing the "broad discretion" to which the school is entitled. *Khan*, 879 F.3d at 845. Thus, Santa Maria is unlikely to succeed on the merits of her ADA and Rehabilitation Act claims because she is unlikely to prove the second element of the claim.

## II. Adequacy of Legal Remedies and Irreparable Harm

The other elements of the preliminary injunction's balancing test are the adequacy of legal remedies and whether the movant would suffer irreparable harm in the absence of an injunction. *Treto*, 82 F.4th 572, 578. In the Seventh Circuit, these elements essentially mirror each other: "Harm is irreparable if legal remedies are inadequate to cure it." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021). At bottom, the analysis looks to whether monetary compensation will make the movant whole. *See Orr v. Shicker*, 953 F.3d 490, 502 (7th Cir. 2020) ("This takes us to irreparable harm, which we have defined as harm that cannot be repaired and for which money compensation is inadequate." (citation omitted) (internal quotation marks omitted)). Because the Court found that Santa Maria is unlikely to succeed in proving the

15

merits of her claim, "the more [Santa Maria] need[s] [these factors to] weigh in [her] favor." *Valencia*, 883 F.3d at 966.

Stritch argues that Santa Maria is not suffering irreparable harm for two reasons. First, it argues that the nine-month gap between when it dismissed Santa Maria from its program and when she filed the instant motion seeking injunctive relief undermines any argument that whatever harm Santa Maria might suffer from the passage of time during this litigation is truly irreparable. Stritch cites several cases from the educational context where students' failures to expeditiously move for a preliminary injunction was at least one factor that doomed their case. *See, e.g.*, *Preston v. Bd. of Trs. of Chi. State Univ.*, 120 F. Supp. 3d 801, 805 (N.D. Ill. 2015) (delay of "approximately seventeen months after [Plaintiff] was expelled" before filing motion for preliminary injunction was "circumstantial evidence that the potential harm to [him] is not irreparable or as great as claimed" (citation omitted)); *Daniels v. Univ. of Notre Dame*, No. 22 C 698, 2024 WL 413828, at *2 (N.D. Ind. Feb. 5, 2024) (two-year gap between student's expulsion from school and motion for preliminary injunction, with "no mitigating explanation . . . suggests that time is not of the essence, and weighs against any finding" of irreparable harm). Second, Stritch argues that the harm Santa Maria alleges is speculative or that money damages will adequately remedy it.

The Court considers Stritch's timeliness argument first. Although Santa Maria initially argues that Stritch does not point to any harm it suffered from her delay in moving for a preliminary injunction, this is a red herring because she must affirmatively justify why the Court should overlook a delay. *See Redbox Automated Retail, LLC v. Xpress Retail LLC*, 310 F. Supp. 3d 949, 953 (N.D. Ill. 2018) ("[W]hether the *defendant* has detrimentally relied on a delay does not affect whether the *plaintiff* has suffered irreparable harm."). Santa Maria's second response,

that her delay in filing this motion is excusable, does just that. She notes that she was unable to immediately bring this case after her second dismissal from Stritch because she spent several months in an intensive outpatient therapy program. Given that delays only provide "circumstantial evidence" regarding irreparability, *Fenje v. Feld*, No. 01 C 9684, 2002 WL 1160158, at *2 (N.D. Ill. May 29, 2002), and Santa Maria was obtaining medical treatment for her disabilities for much of the period between her second dismissal and the filing of her motion for preliminary relief, the delay is excusable and does not *ipso facto* mean Santa Maria is not suffering irreparable harm as the result of Stritch's actions.

Second, the Court rejects Stritch's argument that Santa Maria will not suffer irreparable harm absent an injunction (assuming that Santa Maria ultimately prevails on her claims). "The loss of opportunity to pursue one's chosen profession due to alleged discrimination is widely recognized as constituting an irreparable injury." *Giri v. Nat'l Bd. of Med. Exam'rs*, No. 24 C 410, 2024 WL 756604, at *9 (D.D.C. Feb. 23, 2024) (collecting cases); *cf. Enyart v. Nat'l Conf. of Bar Exam'rs, Inc.*, 630 F.3d 1153, 1165–66 (9th Cir. 2011) ("[Plaintiff] demonstrated irreparable harm in the form of the loss of opportunity to pursue her chosen profession . . . . If she fails the Bar Exam or scores too low on the MPRE to qualify for admission, [she] cannot be licensed to practice law in California."). For Santa Maria to accomplish her goal of becoming a licensed psychiatrist to serve underserved communities, she must first gain admission to and graduate from a residency program in psychiatry. To gain admission to that residency program, she must obtain her doctorate in medicine. If Santa Maria succeeds on the merits of her claims, then the intervening period between her second dismissal from Stritch and the date of her readmission would constitute irreparable harm. *See Giri*, 2024 WL 756604, at *9; *but see Doe v. Princeton University*, No. 3:20 C 4352, 2020 WL 2097991, at *7 (D.N.J. May 1, 2020) ("If

Plaintiff prevails on the merits of his underlying claims and is reinstated to Princeton, he will have suffered a delay in his education, analogous to a suspension, which can be remedied through monetary compensation.").

However, simply because a preliminary injunction could minimize future irreparable harm does not mean that it will remedy previous harm that has already caused damage beyond repair. This Court must consider what granting Santa Maria the injunction she seeks will practically accomplish. *See Princeton University*, 2020 WL 2097991, at *8 ("[W]ith or without injunctive relief, Plaintiff will have a 'gap' on his resume, further underlining the fact [that] Plaintiff" is not entitled to injunctive relief). Given that Santa Maria took a six-month leave of absence from Stritch in 2022 after her first dismissal and that there is now an approximately eighteen-month gap from her second dismissal until now, she will already "forever be forced to explain [her] lengthy tenure within [Stritch] and, ultimately, [her] delayed entry into the professional workforce" even if the Court were to grant her an injunction. *Doe v. Penn. State Univ.*, 276 F. Supp. 3d 300, 315 (M.D. Pa. 2017); *cf. Daniels*, 2024 WL 413828, at *2 ("The gap in Daniels' education has already occurred and cannot be precluded by the injunction he requests."). Moreover, according to Dean Mendez, Santa Maria's academic record placed her at least as low as the bottom third of her medical school class, a fact that would further impact Santa Maria's prospects at obtaining a place in residency. Given these hinderances, the Court harbors serious doubts that injunctive relief would eventually lead to Santa Maria accomplishing her goal of becoming a licensed psychiatrist. *Cf. Daniels*, 2024 WL 413828, at *2 ("The gap in Daniels' education has already occurred and cannot be precluded by the injunction he requests."); *Doe v. Trustees of Indiana Univ.*, No. 20 C 2006, 2020 WL 7028030, at *4 (S.D. Ind. Nov. 30, 2020) ("Doe also argues that . . . [his] gap in education will make it nearly

impossible for him to gain admission to a residency program. Defendants respond that a gap in Doe's education already exists, and a further gap in his education, while this case is resolved, is not irreparable harm. Defendants have the stronger argument.").

Further diminishing Santa Maria's entitlement to a preliminary injunction is that the remedy she seeks here would alter the status quo, rather than preserve it. *See Ind. Civil Liberties Union v. O'Bannon*, 259 F.3d 766, 770 (7th Cir. 2001) ("A preliminary injunction is an extraordinary remedy intended to preserve the status quo until the merits of a case may be resolved."). This raises concerns unique to Santa Maria's progression through Stritch's curriculum. In one hypothetical situation, if the Court ordered Stritch to readmit Santa Maria on a preliminary basis and this case languished for a sufficient amount of time, it is possible that Santa Maria could complete her medical school education without an ultimate resolution on the merits of her claims. If the Court later grants Stritch summary judgment, or a jury finds in Stritch's favor, what then? Will Santa Maria receive her degree? Will Stritch stand by its decision to dismiss her, and not allow her to graduate? Other pitfalls come to mind: if Santa Maria failed a third exam in her surgery clerkship, would that allow Stritch to permanently dismiss her and thereby void the preliminary injunction? What impact, if any, would it have on Santa Maria's present claims if that scenario occurred? The uncertainty the Court would introduce if it granted Santa Maria the preliminary injunction she seeks further counsels against awarding preliminary relief at all.

Santa Maria argues that despite the lack of impact a preliminary injunction will have on her future career prospects, it will nevertheless alleviate "the continued feelings of ostracization and of disability discrimination" she is experiencing as the result of her dismissal from Stritch. Tr. at 268:16–17. In other words, the injunction would vindicate Santa Maria's feelings that

19

Stritch illegally discriminated against her. The Court acknowledges that it can sometimes be strong medicine for an outside authority to recognize that one party unjustly suffered at the hands of another. In this sense, a favorable decision from the Court would bring relief to Santa Maria. But this runs into several issues: first, the Court has already found that it is unlikely that Santa Maria will be able to prove that Stritch *unlawfully* inflicted the injury she is suffering. Moreover, there is no reason why Santa Maria could not receive the same vindication from a favorable jury decision at a later stage of this case versus a preliminary injunction that burdens Stritch today. Finally, the injuries Santa Maria wishes to remedy do not justify disturbing the status quo.

Accordingly, the Court finds that Santa Maria's asserted irreparable injury, though legitimate, does not justify a preliminary injunction.

### III.  Balancing

Santa Maria is unlikely to succeed on the merits of her claims, and, although she will suffer irreparable harm due to her lack of progression towards her professional goals, a preliminary injunction will likely not provide her with sufficient relief to justify disrupting the status quo. Because both of these initial factors weigh against a preliminary injunction, the Court need not consider the interests of non-parties to find that Santa Maria is not entitled to a preliminary injunction. *Valencia*, 883 F.3d at 966 ("The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in [her] favor; the less likely [s]he is to win, the more need it weigh in [her] favor."); *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008) ("If the court determines that the moving party has failed to demonstrate any one of the[] . . . threshold requirements, it must deny the injunction.").

20

## CONCLUSION

For the foregoing reasons, the Court denies Santa Maria's motion for a preliminary injunction [26].

Dated: January 14, 2025

_____
SARA L. ELLIS
United States District Judge

21